**EXHIBIT A**

**[FILED UNDER SEAL]**

1.      I agree that I am guilty of the offenses to which I am pleading guilty, and I agree that the following facts are true.

2.      Beginning in at least 2014, and continuing through in or about January 2020, in the Northern District of California and elsewhere, I agreed with Mohammed NURU, John Porter, Mark Arsenault, and others, to provide payments and other benefits at the request of NURU on behalf of the San Francisco Group of Recology Inc., a waste management company responsible for solid waste collection services in the City and County of San Francisco (the "City").

3.      More specifically, I agreed to and did in fact arrange for Recology to provide such payments and benefits at the request of NURU, who was then a public official with the City and County of San Francisco, knowing and intending that they were made to influence NURU to use his power and perform official acts to benefit Recology's business.

4.      From in or around February 2012 until June 2020, I was the Group Government and Community Relations Manager for Recology Inc.'s San Francisco Group.  I reported to Mark Arsenault, the Vice President and General Manager of Recology's San Francisco Group, from in or around 2014 to in or around the end of 2017.  From in or around January 2018 to June 2020, I reported to John Porter, who replaced Arsenault as the Vice President and General Manager of Recology's San Francisco Group.

5.      During the relevant time, NURU was the director of San Francisco Public Works, also known as the Department of Public Works (herein, "DPW") of the City and County of San Francisco, which regulated Recology.  As Director of DPW, NURU was a powerful public official who had great influence over City business, including the City's relationship with Recology.  For example, NURU presided over the process that governed the rates that Recology could charge in San Francisco for its residential solid waste collection services, and was responsible for making a recommendation as to whether any rate increase for Recology should

1

be approved.  I also understood that NURU was in a position to influence the rates, known as tipping fees, that Recology charged DPW when DPW dumped materials at a Recology facility called Sustainable Crushing.  NURU could also approve, deny, or otherwise affect operational changes that Recology wanted to make.  NURU's power and influence extended not only to business within the purview of DPW, but also to other City departments and agencies.

6.     An essential part of my job at Recology during this time period was to keep Mohammed NURU happy so that he would use his official position in Recology's favor. Specifically, Recology wanted to keep NURU happy so that he would approve, or influence the approval of, Recology's various requests for price increases, access to funds for capital improvements that required NURU's approval, and operational changes.  Porter, Arsenault, and others would often ask me if NURU was happy.  Because of the power and influence he wielded in his official position, a happy NURU was good for Recology's business.  The converse was also true.  Recology understood that an unhappy NURU could be very bad for Recology's business.

7.     In order to ensure that NURU was happy with Recology and to influence him to act in Recology's favor as opportunities arose, I was one of the people that helped direct a stream of payments and benefits to NURU or his designees on Recology's behalf, including financial contributions to organizations at his direction, services, gifts, and other things of value.  In most instances, Nuru or his designee requested the money or benefit and directed where it would go.

8.     For example, at NURU's direction, I arranged for Recology to pay approximately $150,000 per year, in $30,000 installments, to the non-profit organization the San Francisco Clean City Coalition, which I believed to be serving as the fiscal sponsor for a DPW program called "Giant Sweep."  I arranged for these payments from no later than August 2014 through approximately the end of 2019 with the expectation that providing this significant sum of money, the largest scheduled contribution each year by Recology's San Francisco Group, would cause NURU to use his influence to benefit Recology, including in connection with Recology's lengthy rate increase process.  I expected that, as DPW's Director, NURU ultimately could control how

2

this money was used.

9.      As was my practice, I sought approval from my supervisor, Arsenault or Porter, before arranging to pay the approximately $150,000 that Nuru requested each year.  I did not have authority to approve payments this large and do not believe that either Arsenault or Porter had final authority to approve payments of this magnitude either.  I understood that the money Recology sent to Clean City Coalition for Giant Sweep was important to NURU, which I communicated to Porter and Arsenault.  NURU described these payments as "the big one" in our conversations.  Because I understood the importance to NURU of these payments and the value to Recology of keeping NURU happy, I offered to write a personal check when NURU did not timely receive one of Recology's promised $30,000 Giant Sweep payments in May 2015.

10.      At around the same time in 2015, NURU asked me for help finding his son a job. Understanding that Recology was at the time preparing to submit a rate increase application to the City for NURU's approval, I arranged for NURU's son to work at Recology Sunset Scavenger, for which he painted debris boxes.  I expected that Recology's payments and benefits to NURU (like a job for his son) would influence NURU to use his official position to benefit Recology.  I understood that NURU's son was the only high school student so employed by Recology in San Francisco.  NURU's son continued to work at Recology during the school year and summers through approximately June 2017.  I stipulate that Recology paid NURU's son a total of approximately $19,565 during that time.

11.      In or around June 2017, Mark Arsenault advised me that NURU's son could no longer work for Recology because it would not look good for Recology to employ the Director of DPW's son.  I then arranged, with Arsenault's knowledge and approval, for Recology to give a grant to a non-profit on whose board I served, the Asian Pacific American Community Center (APACC) in San Francisco, to create a summer program.  I knew and discussed with Arsenault that the summer program would consist of NURU's son, and that Recology's money would be used to pay NURU's son's salary for the summer.  I also arranged for Recology to fund NURU's son's salary for a second summer at the non-profit in 2018.  By this time, John Porter was my

3

supervisor.  As before with Arsenault, I would have needed Porter's authorization to pay for the second summer's salary for NURU's son.  I stipulate that Recology gave approximately $9,600 to APACC in 2017 and approximately $14,000 to APACC in 2018 for the summer internship program that employed NURU's son.

12.     Each year from at least 2016 through 2019, at NURU's request, I also coordinated Recology's monetary contributions for the DPW holiday party.  I recall NURU first asking for a donation to the holiday party in or around December 2016 during a meeting I attended with Mark Arsenault.  Recology needed NURU's support for certain operational changes relating to the 2017 rate application.  During the meeting, NURU agreed to support Recology's operational changes and asked Recology for $5,000 to help pay for the DPW holiday party.  Arsenault agreed.  NURU frequently requested payments or "donations" from Recology, including during times that we were seeking official assistance from NURU.  I understood – and believe it was understood within Recology management – that providing the payments that NURU requested would influence NURU to act favorably toward Recology, including supporting the operational changes Recology was seeking.

13.     NURU subsequently requested that Recology contribute to the DPW holiday party every year through 2019.  NURU advised me that Lefty O'Doul's Restaurant was catering the holiday parties and directed me to have Recology's checks made out to the Lefty O'Doul's Foundation for Kids, which I knew to be a charity for underprivileged children.  I prepared at least one internal check request form for Recology and described the payment as a "holiday donation" to the Lefty O'Doul's Foundation.  I knew that the money was not a holiday donation to the Foundation and would not be used for underprivileged children.  I directed the money to the Lefty O'Doul's Foundation for Kids because NURU told me to, and I knew that the money would be used to pay for expenses associated with the DPW holiday party.  I believed that NURU wanted Recology to give the money to the Lefty O'Doul's Foundation because Recology was not allowed to give the money to him or to DPW directly.  It was my practice to advise my supervisor at the time, either Arsenault or Porter, that NURU had asked for money for the DPW

holiday party and seek their approval for these contributions.  There is no one else within the San Francisco Group from whom I would have sought approval.  Following approval from Arsenault or Porter, I would arrange for Recology to issue a check to the Lefty O'Doul's Foundation, and then mail or hand-deliver the check to NURU or to somebody from the Lefty O'Doul's Foundation.  I stipulate that I arranged for Recology to give NURU the following amounts each year for the DPW holiday party, in the form of "holiday donations" to the Lefty O'Doul's Foundation:  $5,000 (2016); $15,000 (2017); $20,000 (2018); $20,000 (2019).  I understood that the holiday parties were very important to NURU because they showcased his power and importance in the City.  I attended the parties each year; other executives from Recology also attended at various times, including Porter and Arsenault and the General Managers of the Recology San Francisco Group companies.

14.     Recology also owned and operated a facility in San Francisco, Sustainable Crushing, which accepted material such as concrete and asphalt for a "tipping fee," or price per ton, and processed it into an aggregate.  DPW was Sustainable Crushing's largest customer for dumping materials and Recology knew that the facility was important to NURU.  By the summer of 2018, Sustainable Crushing was losing money; as a result, Recology wanted to raise the tipping fees that it charged DPW.  I understood that Recology needed NURU's support for the price increase.  The General Manager of the Recology company that owned Sustainable Crushing asked me to set up a meeting in the summer of 2018 between Recology and NURU to discuss Recology's desired price increase.  I arranged and attended the meeting, which was attended by NURU, John Porter, and the Recology General Manager.  At the meeting, NURU promised to assist Recology with the price increase.

15.     I also participated in a meeting with NURU, John Porter, and others on November 21, 2018, in which Recology again sought NURU's assistance in obtaining its Sustainable Crushing price increase.  On November 26, 2018, in a phone call, I had a conversation with NURU in which he again promised to assist with the Sustainable Crushing price increase and told me to send him Recology's bills with the new prices.  In that same conversation, he told me

that he needed more money for the DPW holiday party and requested that Recology give him $20,000 for the party.  I agreed that Recology would increase its contribution to the DPW holiday party to $20,000.  Although NURU did not explicitly condition his assistance with Recology's price increase on Recology's agreement to give $20,000 to the DPW holiday party, I understood that this was what NURU wanted based on the phone conversation and my ongoing course of dealings with NURU over a period of years.

16.     After NURU asked me for $20,000 for the DPW Holiday Party, I contacted my supervisor, John Porter, told him about the conversation, and sought his approval for the $20,000 payment.  Porter approved.  I then prepared a check request that, as before, described the payment as a "holiday donation" to the Lefty O'Doul's Foundation for Kids, even though I knew that this was not a holiday donation to the Foundation but was instead a payment for the DPW holiday party.  Porter signed this check request and Recology then issued a $20,000 check to the Foundation.  At NURU's instruction, when I received the check, I had someone at Recology mail it directly to NURU, rather than the Foundation.

17.     Recology also gave NURU other gifts and benefits, which we expected would influence NURU to take official action that would benefit Recology.  For example, in December 2017, Mark Arsenault and I traveled to New York with NURU and City Administrator Naomi Kelly to tour a trash collection system used on Roosevelt Island.  I understand and believe that the City booked NURU and Kelly's airfare and hotel rooms.  However, when Arsenault and I arrived at the hotel where we would all be staying, we agreed that it was not a nice hotel and that it would be embarrassing for NURU and Kelly to stay there.  With Arsenault's knowledge and approval, I arranged for NURU and Kelly to stay at a Courtyard Marriott nearby.  I paid for those hotel rooms using my Recology purchase card and submitted the expenses for reimbursement by Recology.  The total cost of each room, paid for by Recology, was $865.34.  Neither NURU nor Kelly paid me or, to my knowledge, Recology back for the cost of their hotel rooms.  I also paid for meals for at least Kelly during the trip, again using my Recology purchase card.  I also understood that Naomi Kelly was important to Recology because she sat on the Rate Board,

which ultimately approved Recology's rates in San Francisco.

18.     In another example, in June 2016, Recology paid for the funeral of a DPW employee, describing the payment as a "donation for DPW Partnership" to the San Francisco Clean City Coalition.  DPW employee Sandra Zuniga requested that Recology pay the mortuary bill of $3,500.  However, rather than having Recology pay the mortuary bill directly, I coordinated having Recology send the funds to San Francisco Clean City Coalition to pay for it. With Mark Arsenault's knowledge and approval, I requested that the Clean City Coalition invoice Recology $3,500 for a "community service project."  As with the other payments discussed here, we did this because we believed that keeping NURU happy by making these payments was good for business and that, in exchange, NURU would use his position as DPW director to take official actions that would help Recology's business.  After the Clean City Coalition's Executive Director emailed me an invoice for $3,500 for "Donation for DPW Partnership," I arranged for Recology to issue a payment to the Clean City Coalition for that purpose.  Mark Arsenault signed off on the payment.

19.     I am not aware of Recology's San Francisco Group providing donations or financial benefits of this magnitude to any other elected or appointed public official in San Francisco during the period described herein.

20.     I agree that when I played a role in directing this stream of payments and benefits to NURU or his designees, I was acting within the scope of my employment with Recology and for the purpose of benefitting the company.  I was commended on multiple occasions by Arsenault and Porter for my role in maintaining Recology's relationship with NURU and DPW, including in performance reviews I received in my role as Government and Community Relations Manger.  I received bonuses and salary increases reflective of my success.

21.     As described above, this stream of payments and benefits to NURU or his designees was provided with the knowledge and approval of my supervisors, first Mark Arsenault, and then John Porter.  We did this with the understanding and the expectation that in exchange for these payments and benefits, NURU would take official action or use his influence

as DPW Director to benefit Recology's business as opportunities arose, and refrain from taking actions adverse to Recology.  When I received requests for donations or contributions, including requests from NURU, my practice was always to inform my supervisor of the request and who was making it.  When Porter and Arsenault learned that NURU was the person making the request, they would always, or virtually always, agree to the payments and manually sign off on the check request forms indicating their approval of the payments requested by NURU.

22.     Because providing these benefits and items of value to NURU on Recology's behalf in return for NURU's official assistance was the regular course of dealings between Recology and NURU over a period of years, I did not believe it was necessary for either of us to say this out loud.  I knew that Recology was not allowed to give money to NURU or DPW directly, so Recology gave the money to non-profit organizations at NURU's direction.

23.     I stipulate that the City of San Francisco received federal assistance in excess of $10,000 in a one-year period within twelve months before or after the conduct covered by this Plea Agreement.  I further stipulate that the conduct described above was intended to influence or reward NURU in connection with a transaction or series of transactions of DPW that involved $5,000 or more.

24.     I agree that at all relevant times described above, I acted knowingly and with the intent to defraud, that is, the intent to deprive the public of its right to the honest services of a public official, namely NURU, through bribery in breach of NURU's fiduciary duty.  I further agree that my actions were material, that is they were capable of influencing NURU's actions.  In addition, I stipulate and agree that the banking transactions generated by our scheme utilized numerous interstate wire communications, including the checks issued by Recology at NURU's direction to the San Francisco Clean City Coalition, the Lefty O'Doul's Foundation, and the Asian Pacific American Community Center.  I further stipulate that on at least one occasion, in November 2018, I directed someone at Recology to utilize the United States mail to mail a check to NURU at his request for the DPW holiday party.

Other Relevant Conduct

8

25.     After learning about NURU's arrest in January 2020, I deleted text messages and emails that I had exchanged with NURU.

***

The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for my plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within my personal knowledge regarding the charged crimes and related conduct by NURU or others.