1  Hartley M.K. West (SBN 191609)
   hartley.west@dechert.com
2  Taylor Jaszewski (SBN 345094)
   taylor.jaszewski@dechert.com
3  DECHERT LLP
   One Bush Street, Suite 1600
4  San Francisco, CA 94104
   (415) 262-4500 (Tel)
5  (415) 262-4555 (Fax)

6  *Attorneys for Defendant Paul Giusti*

7

                    UNITED STATES DISTRICT COURT
8
                  NORTHERN DISTRICT OF CALIFORNIA
9
                      SAN FRANCISCO DIVISION
10

11
   UNITED STATES OF AMERICA,              Case No. 3:21CR00294-001 WHO
12
                        Plaintiff,        **[AMENDED] DEFENDANT PAUL
13                                         GIUSTI'S SENTENCING
            v.                             MEMORANDUM AND MOTION FOR
14                                         DOWNWARD DEPARTURE AND
   PAUL GIUSTI,                            VARIANCE**
15
                        Defendant.        Sentencing Date: December 14, 2023
16                                         Time: 1:30 p.m.

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.     PAUL GIUSTI'S PERSONAL BACKGROUND ........................................... 2

    A.  Mr. Giusti's Childhood and Family Background ................................................ 4

    B.  Mr. Giusti's Hard Work and Dedication to Recology and His Community ......... 6

    C.  Mr. Giusti's Dedication to His Wife and Family ............................................... 12

    D.  Mr. Giusti's Compassion and Generosity ........................................................ 13

III.    OFFENSE CONDUCT .............................................................................. 15

IV.     COOPERATION ........................................................................................ 15

V.      THE SENTENCING GUIDELINES .......................................................... 16

VI.     CORRECTION TO PSR ............................................................................ 17

VII.    THE COURT SHOULD SENTENCE MR. GIUSTI TO THREE YEARS'
        PROBATION AND 300 HOURS COMMUNITY SERVICE ...................... 17

    A.  Legal Standard ............................................................................................... 17

    B.  The 3553(a) Factors Warrant a Sentence Well Below the Advisory Guidelines ... 18

        1.  History and Characteristics of the Defendant ............................................ 18

        2.  Just Punishment ..................................................................................... 19

        3.  Circumstances of the Offense .................................................................. 19

        4.  Need to Avoid Unwarranted Sentence Disparities .................................... 20

        5.  Deterrence ............................................................................................. 20

        6.  Protection of the Public .......................................................................... 21

    C.  Paul's Substantial Assistance Warrants the Requested Sentence ...................... 21

VIII.   CONCLUSION .......................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Kimbrough v. United States*,
    552 U.S. 85 (2007) ................................................................................................ 16

*Koon v. United States*,
    518 U.S. 81 (1996) ................................................................................................ 18

*Nelson v. United States*,
    555 U.S. 350 (2009) .............................................................................................. 17

*Pepper v. United States*,
    562 U.S. 476 (2011) ........................................................................................ 16, 17

*United States v. Barraza*,
    655 F.3d 375 (5th Cir. 2011) ........................................................................... 15, 16

*United States v. Carmona-Rodriguez*,
    No. 04-cr-667-RWS, 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) ........................ 20

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ........................................................................... 16, 17

*United States v. Edwards*,
    595 F.3d 1005 (9th Cir. 2010) .............................................................................. 20

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2nd Cir. 2014) ................... 17, 19

*United States v. Mohamed*,
    459 F.3d 979 (9th Cir. 2006) ................................................................................ 17

*United States v. Ray*,
    930 F.2d 1368 (9th Cir. 1990) .............................................................................. 19

*United States v. Saeteurn*,
    504 F.3d 1175 (9th Cir. 2007) .............................................................................. 19

*United States v. Vigil*,
    476 F. Supp. 2d 1231 (D.N.M. 2007) ................................................................... 18

DEF. GIUSTI'S SENTENCING
MEMORANDUM
3:21-CR-00294-001 WHO

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Statutes**

18 U.S.C. § 3553 ........................................................................................................ *passim*

U.S.S.G. § 2C1.1(b)(2) ........................................................................................... 15

U.S.S.G. § 5K1.1 ........................................................................................................ 1

**Other Authorities**

Local Rule 32-5(b) ..................................................................................................... 1

In accordance with Criminal Local Rule 32-5(b), defendant Paul Giusti respectfully submits his sentencing memorandum to provide the Court with additional information not contained in the Final Presentence Investigation Report (PSR); to discuss the loss calculation and 18 U.S.C. § 3553 factors; to join in the United States' motion for a downward departure pursuant to U.S.S.G. § 5K1.1 based on his substantial cooperation; and respectfully to suggest a sentence of three years of probation with 300 hours of community service as "sufficient but not greater than necessary" to effectuate the goals of § 3553.

## I.     INTRODUCTION

Paul Giusti comes before this Court for sentencing, having pled guilty to conspiring with his supervisors at Recology and a city official to commit honest services wire fraud and bribery. A child of immigrants, without a college degree, Paul started working at Recology's predecessor company as a trash collector on the back of a garbage truck when he was 22. Paul prided himself on hard work, discipline, and helping the people of San Francisco, particularly immigrant communities.

Paul worked his way from collector to truck driver, to operations, and ultimately to Community and Government Relations Manager based on his skill in communicating with the public. When he was promoted to an operations role, his supervisor, John Legnitto, instructed him to give special benefits to Mohammed Nuru – the Director of San Francisco's Department of Public Works and deemed to be an important partner for Recology – to "keep him happy." Plea Agreement Ex. A ¶ 6. This theme continued and was reinforced by his next two supervisors, Mark Arsenault and John Porter. Paul understood that keeping Nuru happy was a fundamental part of his job – in fact it was explicitly part of his annual performance evaluations. There is no question that Paul understood, as he readily admitted to the government, that all of the payments that he facilitated from Recology to Nuru were intended to influence Nuru to act to benefit Recology as opportunities arose.

Paul greatly regrets his role in the offense and wishes more than anything that he could undo it: "he is embarrassed, humiliated and wishes he could go back and change the mistakes he

made."[1]

He is deeply ashamed that his actions harmed the people of San Francisco, whom he spent his entire adult life working to serve, and whom his father spent a lifetime serving before him. As demonstrated by his letters of support from 29 community members, former colleagues, friends and family, Paul is hard-working, loyal, generous, kind, supportive, and loving. He cares deeply about family, both immediate and extended, as well as his friends, his neighbors, and his community.

Because Paul is someone who takes responsibility for his actions, he cooperated immediately with Recology's and the government's investigation, including volunteering to both investigations that he had deleted messages with Nuru when he heard of Nuru's arrest, embarrassed by his close relationship with Nuru and worried that his telling Nuru "he would do anything for [him]" would be misinterpreted. Paul provided indisputably substantial cooperation over the course of six proffers to the U.S. Attorney's Office, starting before he was charged by Complaint, and additional information through numerous attorney proffers. His cooperation ultimately led to the Deferred Prosecution Agreement by Recology and guilty pleas by Mohammed Nuru and Paul's supervisor, John Porter. He has also provided information about others under investigation by the U.S. Attorney's Office and others.

Paul understands that depriving the people of San Francisco of their right to honest services is a serious breach that requires consequences. The sentencing factors taken as a whole – particularly Paul's history and characteristics, the circumstances of this offense, and the need to avoid unwarranted sentencing disparities – together with Mr. Giusti's substantial cooperation support a sentence of three years' probation with 300 hours of community service as "sufficient and not greater than necessary."

## II.     PAUL GIUSTI'S PERSONAL BACKGROUND

The letters of support submitted by 29 of Paul's community members, former colleagues,

---

[1] Letter of support from Caroline. Yee. All of the letters of support were provided to the Court by U.S. Probation and are denoted in this Memorandum by the last name of the author (and first initial where needed for differentiation).

friends, and family members[2] share memories and stories of Paul that reveal him to be "a person of integrity, compassion, and dedication."[3]

Leno Bellomo, who knew Mr. Giusti for 35 years during his time at Recology and who now serves as a director and officer of the 100 Club of San Mateo County, an organization dedicated to supporting San Mateo Peace Officers, states: "Throughout our long association, I have found Paul Giusti to be a person of integrity, honesty, and fairness." He further observes that "Paul Giusti is a person of high moral character and genuine concern for others. His actions have consistently reflected his commitment to fairness, kindness, and understanding."

Joseph Lepera, a judge *pro tem* in Marin County Superior Court, writes about Paul's "outstanding character," "his unwavering personal integrity," and his "honesty and accountability." Ann Wooliver, Paul's neighbor since 1969 and former Assistant Chief Deputy of the Marin County Probation Department, says "I have always known Paul to be a person of honesty and integrity and I have the utmost trust in him." Pastor Floyd Trammell, Board Chair of the Northern California Martin Luther King, Jr. Foundation, writes that Paul is "a man of integrity and graciousness."

Others similarly describe Paul as "hard working, honest, generous and loyal"[4] and bearing "the solid personal qualities and high integrity that defines him as a person."[5] "[A] person of integrity. Paul was a straight shooter who could be depended on to follow through on any given task."[6] "[H]onest" and "a good role model for my children to look up to."[7]

Paul is universally regarded as kind, considerate, compassionate, and generous. "[T]he Paul I know would give a friend the shirt off his back, and go out of his way for other people."[8] "He is one of the sincerest and kindest people you will meet."[9] "[A] hard-working and honest

---

[2] Of the 26 letters submitted, three were submitted jointly on behalf of two people.
[3] Lepera letter.
[4] Figoni letter.
[5] Singer letter.
[6] Sullivan letter.
[7] P. Giusti letter.
[8] Figoni letter.
[9] T. Childers letter.

man with a kindness and willingness to help with anything needed."[10]  And almost every single letter notes Paul's generosity in sharing his exceptional cooking – "carefully prepared dishes made with love"[11] – not only with family, friends, and neighbors, but across San Francisco communities.

By all accounts, the conduct for which Paul has been convicted is "deeply aberrant of who he is as a person,"[12] far out of line with the Paul who is well-known to his family, friends, colleagues, and members of his community.

**A. Mr. Giusti's Childhood and Family Background**

Born in San Francisco to Italian immigrants, Paul Giusti was brought up to believe in hard work and family as core values.  Paul's father worked for Sunset Scavenger as a garbage collector.  Due to the long hours required of a garbage collector, Paul's mother stayed home to care for her four sons.  It was a "closeknit family,"[13] and Paul's maternal grandparents were a big part of Paul's life as well before their passing.  Paul's father passed away in 2000 from a stroke and his mother passed away in 2010 due to other health issues.  PSR ¶¶ 58-59.

When Paul was a young boy, he was diagnosed with severe asthma, requiring multiple emergency room visits and heavy reliance on an inhaler.  As a result, he was not able to participate in sports and often felt isolated from other children.  PSR ¶¶ 60, 67.

Paul has always valued hard work and being the best employee he could be.  He started working several jobs throughout high school and, after graduating, while taking classes at the local community college before ultimately dropping out.  At 22, Paul started working as a trash collector, beginning the career to which he would devote the rest of his life.  Paul's full work history is detailed in the following section.

After a brief marriage in his 20s that ended due to his inability to have children, Paul threw himself into his work and community involvements.  PSR ¶ 62.  In his 50s, Paul met his wife Caroline Yee at a benefit dinner and they married three years later.  Paul is devoted to

---

[10] D. Giusti letter.
[11] Cecilia Yee letter.
[12] Singer letter.
[13] Wooliver letter.

Caroline, and has become the "rock" in their extended family.[14] His family and friends recognize that to him, "family is everything."[15] He is a "devoted husband, brother, and son," whose "unwavering commitment to his family's well-being is an inspiration to everyone who knows him."[16]

With the passing of his own parents, he took on care for his father-in-law and mother-in-law. Paul's father-in-law was diagnosed with lymphoma in April 2022. According to his wife:

> Even during the stressful times with [this pending case], Paul always made sure to help make the last year of my father's life a fun filled and happy one – always bringing together our family with his excellent culinary skills which my father always enjoyed. I needed to and continue to rely heavily on Paul to take care of me and our household this past year and both my sister and I were taking care of both our parents – my father who was going through his chemo treatments, going in and out of ER, and my mother who has early dementia and stage 2 diabetes.

Following chemotherapy treatments and two rounds of remission, the cancer returned and Paul's father-in-law passed in July 2023.[17] Since his father-in-law's passing, Paul's mother-in-law stays with Paul and his wife Friday through Monday. PSR ¶ 63. Paul prepares her meals, keeps her company, drives her to medical and other appointments, and fixes whatever needs fixing in her home.

On the cusp of turning 68 at the end of this month, Paul focuses on being grateful every day for the time he gets to spend with his wife, brothers, and extended family, and the opportunity to make their lives better. His asthma, while mitigated after he became an adult, has worsened in recent years, requiring daily medication and inhibiting strenuous exercise. Paul had a heart attack in 2020, which required surgery to insert stents, and he has required treatment a few times since then for heart-related issues. He takes daily heart medication. PSR ¶¶ 60, 67-68. It is worth noting that Paul has a significant family history of heart issues, including three family members who died before the age of 75 (one at 54) due to heart complications. Both he and his brother have had heart attacks, resulting in major heart surgery.

---

[14] E. Giusti letter.
[15] Caroline Yee letter.
[16] Lepera letter.
[17] Caroline Yee letter.

DEF. GIUSTI'S SENTENCING
MEMORANDUM
3:21-CR-00294-001 WHO

## B. Mr. Giusti's Hard Work and Dedication to Recology and His Community

As noted, Paul began working at age 22 as a garbage collector for Recology's predecessor company, Sunset Scavenger, in 1978. His job entailed riding on the back of a garbage truck, running back and forth to homes, grabbing garbage cans and tipping them into the truck. Like his father and two brothers, Paul felt proud to be a part of the Teamsters union.[18] After several years, he was promoted to truck driver. His first involvement on the business side of the company came in the early 1990's when he was tasked with enlisting businesses into Sunset Scavenger's recycling program. Based on his success with the recycling program, Paul was promoted to Operations Manager for Recycling in 1994. He was later promoted to General Operations Manager, then to Business Unit Manager when Sunset Scavenger merged with other waste companies to form Norcal Waste Systems in the early 2000s.

Without a college degree, Recology's CEO told Paul that he would never be able to move into upper-level management. But noticing Paul's ability to communicate well with the public – from angry customers to members of city government (including the notoriously difficult head of San Francisco's Department of Public Works, Mohammed Nuru) – the company designated him the Community & Government Affairs Manager in 2012. As noted in one of his letters, Paul's "strong communications skills had drawn positive attention from his managers, as did his easygoing ability to connect with others. He'd volunteered to speak to community groups about Recology, and he was so successful at making a great impression on his audiences that he'd been promoted to a community outreach role."[19]

The new role involved representing Recology before local business organizations, coordinating with government agencies, contacting community organizations in issues regarding Recology operations, and addressing any issues with customers. It also entailed arranging Recology's sponsorship of community events and partnerships with charitable causes.

---

[18] Paul's wife, Caroline Yee, notes the "pride [Paul] had in his abilities when he was younger and sense of belonging by being a part of the Teamster Union along with two of his younger brothers all following in their father's footsteps."

[19] Clemens letter.

As Community and Government Affairs Manager, Paul reported to the San Francisco Group Manager, a role held by John Legnitto until 2014, Mark Arsenault until 2017—when he was promoted to Chief Operating Officer—and John Porter until Giusti's retirement in 2020. Mr. Legnitto told Paul that his job was to keep customers and government officials happy with Recology. Mr. Legnitto involved Paul with his meetings and communications with Nuru, who by then was the DPW Director, and emphasized the need to keep Nuru happy. Paul understood that Nuru had the ability to approve, or influence the approval of, Recology's various requests for price increases, access to funds for capital improvements that required Nuru's approval, and operational changes affecting Recology. Mr. Legnitto trained Paul that part of his job involved taking Nuru out for meals and agreeing to his requests for contributions. On such contributions, Paul could only authorize expenditures up to $5,000, so he was required to obtain authorization from his Group Manager on any expense above that, although he typically notified his supervisor even below this threshold. Paul understood that Recology's efforts to keep Mr. Nuru happy were to influence him to act in Recology's favor as opportunities arose. (Plea Agr. Ex. A, ¶¶ 4-7)

When Mr. Legnitto died in 2014, Paul became the primary point of contact at Recology for Nuru, who had a reputation within the company as being difficult. Paul's everyman-style seemed to suit him and, over time, Paul and Nuru became friends; Paul looked up to and respected him. Like Mr. Legnitto, Mr. Arsenault and Mr. Porter often asked Paul if Nuru was happy. Plea Agr. Ex. A, ¶ 6. And despite direct interaction with government officials being a formal part of his job description, Paul never received training regarding restrictions on contributions or gifts to government officials.

The letters of support consistently describe Paul as being incredibly hard-working. His wife, Caroline, recalls that while working at community dinners he would regularly be "the first one to work and would not leave until the last guest said goodnight, the kitchen was clean, and the last dish had been put away." She also recounted stories of him getting up at 3:30 a.m. wearing shoes that were still wet from the prior day's rain to work in the dark alleys of San

Francisco. Joe Lepera recalled him working extra shifts when facing financial hardship, showing his "commitment to financial responsibility and respect for others' resources."

Robert Figoni, a Sunset Scavenger colleague of Paul's from 1980 to 2005, noted Paul's "diligence" stating: "He was always the consummate 'company man,' doing his work to make the company more successful."[20] Paul served on the Advisory Committee, and worked on the company newsletter "to promote comradery among employees", and "was always one to go the extra mile." Figoni further describes him as "hard working, honest, generous and loyal," as well as "compassionate" – "the Paul I know would give a friend the shirt off his back, and go out of his way for other people."

Retired Sunset Scavenger employee Ronald Walton, who reported to Paul, recalls "Paul led by example, coming in early and staying late. He also endeavored to change the discriminating practices that had existed for years. . . . Paul willingly opened his mind to creating a new inclusive environment that actually united our company under his leadership. Nothing was more evident as when we hit a snag in hiring experienced African-American drivers who had years of commercial driving experience but were flagged in background checks because of having small infractions on their records as youths. Paul took the time to set up second interviews, asking tough questions, and hired them because he was impressed with the way they turned their lives around. These drivers still work and thrive to this day at our company because of Paul's willingness to look past the mistakes they made in their youth." After becoming district manager, "Paul encouraged me to go to all of their community meetings to find out how we can be of service. Bayview-Hunters Point seemed to have more sicknesses and cancer than the other districts. Each year the Southeast Community Center hosted a 'Health & Wellness Seminar,' but was not getting the response it had hoped for. Paul and I came up with the idea of offering a lunch component on their flyer in which Recology cooked BBQ and vegetables—and it worked. They quadrupled their attendance, and many benefited from the medical assistance offered--and we provided the lunch."[21]

---

[20] Figoni letter
[21] Walton letter.

One letter writer described how his initial anger upon hearing about Paul's involvement in Nuru's scheme "shifted to profound sadness. I considered the Paul I know, who started his work life grabbing other people's garbage, anticipating exactly zero upward career opportunities, who had risen through the ranks of Recology (despite being told he wouldn't be eligible, given his lack of a degree) by doing the job his bosses and mentors had taught him how to do - always trying to do his best." The writer reflects: "I have regularly thought about how my life would have been different had I had different early bosses and mentors - bosses with fewer scruples and ethics. What damaging lessons might I have eagerly learned from them? What actions would I have taken to further our organizational goals, perhaps unquestioningly, due to my gratitude for being given opportunities to which I thought I was unentitled?"[22] In acknowledging Paul's guilty plea to participating in "practices that have severely undermined public trust", the writer states, he does not doubt that in doing so Paul "worked hard to follow the patterns others had taught him at Recology. I know Paul to be intelligent; I don't question whether he knows now that he did things he shouldn't have done. And I'm unsurprised by his decision to plead guilty and cooperate with prosecutors - I believe Paul is the kind of person who accepts responsibility." Finally, the writer observes, "I find it near-impossible to believe that Paul Giusti created any of the illegal schemes he furthered; he simply did his job in the way he was taught to do it."[23]

Many other writers note Paul's compassion for others, commenting on his willingness to provide support and guidance to colleagues "at his own risk."[24] Ron Proto, who met Paul in 1994 when he joined Sunset Scavenger as General Manager, described him as "thoughtful, kind, knowledgeable, and well-spoken. He immediately put me at ease with his sincerity and honesty and became my go-to person." Proto observed that Paul "let his actions speak for themselves. Over the next two to three years, Paul became a valuable management team member and my trusted confidant. I could always rely on Paul to help me implement the most difficult tasks in the garbage business, cut out collection routes, and reduce crew size." He recounted Paul's

---

[22] Clemens letter.
[23] *Id.*
[24] Bellomo letter.

thoughtful concern for the community: "Paul always had the customer in mind. I recall a customer writing a lengthy letter describing how our service disappointed him. Paul got a copy of the letter and came to me to say he would handle it. Paul also taught me that if a customer takes the time to write a detailed letter complaining about their service, the customer must be right. As he headed out the door, he said, you don't mind if we give the customer a $10 credit on their bill? From then on, if a customer had a legitimate complaint about repeated poor service or the conduct of one of our workers, we gave them a credit on their bill."[25]

David Mauroff, who currently works with the San Francisco Pretrial Diversion Project, recalls Paul as a "ubiquitous presence due to the various neighborhood functions where he and the Reoclogy barbecue pit would feed the crowds. I got to know him over time and was always amazed at his generosity and kind spirit. Even on a moment's notice, if the mobile barbecue pit were available Paul would make it happen." Mauroff described Paul's generous support of the Boys & Girls Clubs, building community and connection at public housing sites and in the most marginalized San Francisco communities, "between communities and individuals that usually didn't share the same space." Mauroff further described how Paul helped him launch a social enterprise with men and women involved in gangs and violence at our properties: "Paul was one of the first people I called. He didn't hesitate and volunteered to support" the group. Moreover, Paul "became a mentor and endless source of information, teaching the Green Streets entrepreneurs, who had no business experience outside of the street economy, about waste management pricing, operations and the value of recycling and composting. He is even featured in the Green Streets documentary work in progress, where they refer to him as the Santa Claus of trash. Green Streets was started in 2010 and exists to this day under the ownership of one of the individuals Paul supported. Again, it's not like we had anything to give, but Paul never asked for acknowledgment or recognition." Mauroff describes Paul as "selfless" and "humble."[26]

Ted Fang, the former Editor and Publisher of the San Francisco Examiner turned community organizer, describes Paul as "one of the most understated, forthright, compassionate

---

[25] Proto letter.
[26] Mauroff letter.

and hardworking people I have known. . . .  Above all, he has always been a garbage man, focused on cleaning out the garbage in this City, and promoting recycling of waste in San Francisco."  When Mr. Fang sought to develop a campaign to end Hepatitis B in San Francisco, he found that Paul, having learned that garbage workers were particularly susceptible to infection due to the risk that they were scratched by a syringe or sharp object when collecting garbage, "had helped to create a model Hep B prevention program with vaccinations for all garbage company employees and an educational program about preventing and treating Hep B infection to avoid it developing into liver cancer."  The program that Paul developed served as a model for San Francisco's Hep B vaccination and education efforts, which in turn led to initiation of the U.S. Department of Health and Human Services creation of a National Hepatitis Action Plan.  Mr. Fang credits Paul with the inspiration.[27]

Paul's wife shared an anecdote from 2018 that attests to Paul's deeply good character: "Sometime before 7:00 a.m. that morning, a terminated employee, a large 20-something year old man that had been harassing and stalking a female colleague, gained access to the building.  From his office, Paul saw and intercepted him at a doorway before he could make his way to the rear of the building where she sat.  Paul tried to reason with him and talk him into leaving but to no avail, and the man tried to push his way through the doorway forcing Paul, at that time a 63-year-old asthmatic man, to tackle him to the ground and do his best to hold him down, wrestling and yelling until some of the other district supervisors could get to the front and help."  Ultimately the police arrived and no one was hurt.  "That is my husband – the type of man who jumps into action with little thought to his own well-being to keep a female colleague safe from a deranged individual."[28]

More than one former colleague noted Paul's dedication to mentorship.  Patricia Aleman, a public policy employee of the San Francisco Chamber of Commerce who transitioned to Recology stated that "Paul became my mentor.  He made sure that I understood the operations – by giving me tours of the multiple facilities, showing me the routes, and telling me the

---

[27] Fang letter.
[28] Caroline Yee letter.

history/evolvement of the company. I could tell his devotion and passion for the industry. . . . Paul is that person you can call on when you need a favor, and you know he'll be there for you."

### C. Mr. Giusti's Dedication to His Wife and Family

The Court has received numerous letters of support from Paul's family, both immediate and extended. They all speak of his kindness, generosity, and his excellent cooking. Paul's nephew Joe recalls Paul loaning him money to buy a fixer upper house when he could not get a bank loan, from which Joe was able to repay Paul in 18 months. He states: "Paul is a man who loves his family deeply, I look up to him in so many ways, he is a friend as well as an uncle."[29]

Paul's brother's stepdaughter Nicole Childers describes him as "a very thoughtful and kind man who accepted and opened his arms to me despite not being blood related. He has given great advice specifically about attending college. He has caused my life to be filled with laughter and positivity."[30]

His nephew Justin recounted when he unexpectedly needed a place to live during his last semester of college: "Paul stepped in with the idea of an Airbnb, and I was able to find one near the campus, and Paul graciously paid for the whole thing, and I was able to complete my degree and not worry about a place to live. He refused repayment, said he was proud to contribute to my education and degree. . . . He always puts family first, even above himself. He is selfless and kind, always ready to step in and help."[31]

Paul's sister-in-law observes that "Paul does these types of things without even thinking, they are second nature to him. He is incredibly family oriented, and is a very stable, honest man and an absolute rock in our family."[32] Meanwhile, his niece says "His huge heart, his empathy, his willingness to extend his care and time to anyone who needs it are just a few of the reasons I've always admired him. . . . [H]e is one of the sincerest and kindest people you will meet."[33]

Paul is known for his "huge patience for teaching and introducing his many hobbies to"

---

[29] Joe Giusti letter.
[30] Childers letter.
[31] Justin Giusti letter.
[32] Erika Giusti letter.
[33] T. Childers letter.

his niece and nephew, mentoring them and offering his "influence and guidance".[34] "Paul was incredibly proud that our children both chose the university route as he regrettably didn't have this opportunity." "He instilled in our kids the importance of hard work. . . he has been a role model to us all."[35]

His sister-in-law Cecilia describes Paul as "patient and understanding" and the "smartest, kindest, most right-minded, generous and stand-up guy that we know," with "simple, honest values centered around hard work and family."[36] Further, she notes that "Paul recognizes his mistakes and has paid dearly for them financially and in reputation. He has told us how he wishes he could go back and change things."[37]

**D. Mr. Giusti's Compassion and Generosity**

Paul's compassion and generosity extends far beyond his family to those throughout the city of San Francisco. He regularly volunteered his time with the Asian Pacific American Community Center (APACC) where he served as a board member. He provided tremendous support to Green Streets, an organization that helps formerly incarcerated individuals and public housing residents train for environmental and waste management jobs. He frequently attended community events to support organizations like Tenderloin Neighborhood Development Corporation. Supporters note that he is "committed to the betterment of the community. . . compassion and generosity are also at the core of Paul's character . . . he goes "out of his way to assist both friends and strangers during difficult times. His empathy and willingness to help others have made an immeasurable difference in many lives."[38] He "demonstrate[es] selflessness with his time and support."[39]

Sam Singer, founder of an award-winning communications agency, reports on Paul's participation in "community events to assist the neediest in our city, immigrants, the economically disadvantaged, and others struggling to make ends meet. He took extra time and

---

[34] Ronayne letter.
[35] Ronayne letter.
[36] Cecilia Yee letter.
[37] Id.
[38] Lepera letter.
[39] Bellomo letter.

paid extra attention to these people, ensuring that they got the food, goods, or information they needed at these community-based events. What especially struck me was the kindness and time he took with each person to give them the respect and dignity that a human being deserved."[40]

Retired Public Safety Officer Daniel Sullivan describes "Paul was very active in all communities of San Francisco. From doing community barbecues to teaching classes at night on composting and recycling. As a Director APACC (Asian American Community Center), Paul worked endless hours to achieve the goals of the Center to provide low income immigrant families, with limited or no English proficiency, support in the form of education and resources to become self-sufficient. The ultimate goal was for families to thrive and the community to be confident, healthy, strong and safe. Paul was well liked and a trusted leader. . . . Paul is a valued member of our community with years of service to the community ahead for him."[41]

Former San Francisco Police Commissioner and Chair of the Chinatown Neighborhood Association, Pius Lee, notes that Paul "was a good friend of the Chinese community," who was able to get Recology to pick up garbage for free after Chinatown Night Markets and Chinese New Year celebration.[42]

Myriam Chen, a board member of the Asian Pacific American Community Center (APAAC), writes that since Paul's service as Board Chair in the 2010s, "Paul and I worked assiduously together developing policies to improve the livelihoods of immigrant families in Visitacion Valley. Over the years of working together, I got to know Paul and found him to be honest, compassionate, generous and caring." Noting that Paul displayed "incredible support and dedication" as Board Chair, Ms. Chen states that his "compassion, tireless efforts and unwavering commitment in improving immigrant lives have left a lasting impact that continues to resonate within the organization." "Paul's willingness to go above and beyond the call of duties exemplified the kind of leader he was and the genuine commitment he had in making a positive difference in the lives of others."[43]

---

[40] Singer letter
[41] Sullivan letter
[42] P. Lee letter
[43] Chen letter.

DEF. GIUSTI'S SENTENCING
MEMORANDUM
3:21-CR-00294-001 WHO

## III.    OFFENSE CONDUCT

Paul's offense conduct is thoroughly described in the factual basis forming Exhibit A of his Plea Agreement.  He served as the primary point of contact for Nuru's requests for funds from Recology.  From 2014 to 2019, he helped arrange for Recology to contribute, at Nuru's direction, $150,000 a year (for a total of $750,000) to a San Francisco non-profit for the a city clean-up program known as the "Giant Sweep."  Paul continued these arrangements that were started by his supervisor, John Legnitto.  He arranged for payments for funerals, jobs for Nuru's son (as he knew Mr. Legnitto had previously arranged for Nuru's daughter), and annual donations for holiday parties that Nuru organized.  And when he traveled with his supervisor and Nuru, his supervisor and he agreed that the hotel in which Nuru was supposed to stay was not sufficiently nice and charged a better hotel to Recology.  Paul understood that these payments were designed to influence Nuru to act in Recology's favor, and he understood that the holiday party contributions were donations to a children's charity.  He nonetheless took all of these actions, as the government recognizes, acting within the scope of his employment at Recology for the purpose of benefitting the company and not for his own financial benefit.  Each of these payments was approved by, and in some instances expressly instructed in advance by, his supervisors.

The significant loss value that represents the total of the payments Paul facilitated reflects his long tenure with Recology, under numerous supervisors.  His conduct, while very much illegal and harmful to the people of San Francisco, was never a secret.  Rather it was openly directed or approved by each of his supervisors on behalf of the company.

## IV.    COOPERATION

The United States recognizes Paul's immediate and substantial cooperation.  He admitted his wrongdoing to Recology in its internal investigation and to the government.  His guilty plea and cooperation resulted in the admission of wrongdoing by Recology, the guilty plea by Nuru, and eventually the guilty plea by his supervisor, John Porter.  He participated in at least six proffers and provided additional information through counsel at least seven times.

**V.    THE SENTENCING GUIDELINES**

Defense counsel raises one legal objection to U.S. Probation's Sentencing Guidelines calculation. Application Note 3 to U.S.S.G. § 2C1.1(b)(2) instructs that the fair market value of services rendered to a victim, before an offense is detected, should be deducted from the loss figure. *See* U.S.S.G. § 2C1.1(b)(2), comm. App. N. 3, incorporating U.S.S.G. § 2B1.1, comm. App. N. 3(E)(i). Here, the loss calculation of $1,017,530.34 does not credit the fair market value of services rendered to the people of San Francisco through the Giant Sweep. The correct value is thus $267,530.34, which corresponds to a 12 (rather than 14) offense level increase.

Section 2C1.1(b)(2) instructs that the offense level be increased according to § 2B1.1's loss table using the value of the payment to the public official. Application Note 3 to § 2C1.1 provides that "'[l]oss', for purposes of subsection (b)(2), shall be determined in accordance with Application Note 3 of the Commentary to § 2B1.1 (Theft, Property Destruction, and Fraud)." Application Note 3 to § 2B1.1, in turn, states "Loss shall be reduced by . . . the fair market value of . . . the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, comm. App. N. 3(E)(i).

Because the victim of the offense is the people of San Francisco, this reduction to the loss value pertains specifically to Recology's payment of $750,000 to Clean City Coalition for the Giant Sweep, for which there is no dispute that services were truly rendered to the people of San Francisco. The Office of the City Controller issued a "Public Integrity Review, Preliminary Assessment," dated September 24, 2020, which analyzed third-party donations to city departments and found that these payments appeared to generally be for legitimate public purposes.

This interpretation is consistent with the Fifth Circuit's analysis in *United States v. Barraza*, 655 F.3d 375 (5th Cir. 2011). There, the defendant argued that the calculation of the bribe value should deduct $2000 paid for legitimate legal fees from the $5100 payment he received. The court analyzed the same application note language at issue here: "The Guidelines provide that the bribery loss amount should be reduced by the fair market value of services

rendered by the defendant to the victim 'before the offense was detected.'" *Id.* at 385 (emphasis added). However, because the legitimate services were rendered after the offense was detected, the court declined to reduce the bribe value. *Id.* at 386.

Here, the services rendered for the Giant Sweep concluded in 2019, before impropriety in the Clean City Coalition payments was detected. Accordingly, the legitimate value of those services should be deducted.

The government contends that there is some portion of the Clean City Coalition payments that was used for purposes that did not benefit the people of San Francisco. The defense has not been provided with discovery or a proffer as to that amount, but understands it is relatively small. If it is unknown or cannot be determined with certainty, the full $750,000 figure may be used as a "reasonable estimation of the loss." U.S.S.G. § 2B1.1, comm. App. N. 3(C).

## VI. CORRECTION TO PSR

Mr. Giusti requests that the Court permit a correction to the PSR, which was provided to the Probation Office but appears to have been omitted:

> ¶ 71: Mr. Giusti objects to the description of his financial liabilities as "back taxes." Mr. Giusti has always paid his taxes on time. The described tax liabilities consist of state and federal taxes for 2022 and estimated state and federal taxes for 2023. These are due on October 16, 2023.
>
> Additionally, the correct amount is $74,049 as opposed to the $65,049 cited in the Preliminary PSR.

## VII. THE COURT SHOULD SENTENCE MR. GIUSTI TO THREE YEARS' PROBATION AND 300 HOURS COMMUNITY SERVICE

### A. Legal Standard

Pursuant to 18 U.S.C. § 3553, a district court must strive to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)). This parsimony provision is the sentencing statute's "overarching" principle. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

The sentencing judge should consider "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the . . .

punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011). The Court may not "presume that a sentence within the applicable Guidelines range is reasonable"; rather, the Guidelines are but one sentencing factor among many that courts must consider. *Nelson v. United States*, 555 U.S. 350, 352 (2009). These cases teach that sentencing must be individualized, and affirm district courts' power to depart from the Guidelines in appropriate cases. *See United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006) ("any deviation from the applicable advisory guidelines range [is] viewed as an exercise of the district court's post-Booker discretion and reviewed only for reasonableness.").

To determine the appropriate sentence, the court is directed to consider all the factors listed in 18 U.S.C. § 3553(a): (1) the history and characteristics of the defendant; (2) the need to provide just punishment for the offense; (3) the nature and circumstances of the offense; (4) the need to avoid unwarranted sentencing disparities; (5) the importance of affording adequate deterrence to criminal conduct; and (6) the need to protect the public from further crimes. *Pepper*, 562 U.S. at 491; *Carty*, 520 F.3d at 991. Here, these factors all support the imposition of a sentence of three years of probation with 300 hours of community service.

**B.     The 3553(a) Factors Warrant a Sentence Well Below the Advisory Guidelines**

**1.     History and Characteristics of the Defendant**

The letters to the Court submitted by Mr. Giusti's community members, former colleagues, friends, and family consistently show Mr. Giusti to be a generous, kind, compassionate, and hardworking. Indeed, multiple letter writers describe him as the consummate company man, and perhaps that was part of what led him astray – he focused on doing as good a job as he could at what he understood his job to be, and that included taking inappropriate actions to influence Nuru. But all of the letters attest that his "personal history and characteristics starkly contrast with the nature and circumstances of" this crime. *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2nd Cir. 2014). His strong family and community support, his unflagging work ethic, and the admirable trajectory of his life all counsel in favor of a sentence of 300 hours of community service as part of a three year term of probation.

### 2. Just Punishment

In deciding upon a sentence that is sufficient but not greater than necessary, the Court should consider the extent to which Paul has already suffered as a result of these proceedings. He was forced to resign from Recology, a company that he had devoted his entire adult life to. Paul has suffered the loss of his volunteer positions in the community, and importantly his reputation. He is deeply ashamed of his conduct that led him here. Although many friends and family have steadfastly remained by his side and lent him support during this challenging time—as demonstrated by the dozens of letters of support submitted to this Court—this investigation and trial have caused Paul great anguish and emotional pain. This case has been followed closely by the media, and Paul has been the subject of numerous unflattering news stories in major news publications. *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (accounting for the "incalculable damage to [the defendant's] personal and professional reputation as a result of tremendous media coverage of his case" as a collateral consequence for the purposes of "fashioning a just sentence").

To have all of that disappear has been devastating. Also devastating has been the financial impact. At age 68 at the end of this month, Mr. Giusti has little hope of new employment. He has spent significant resources on counsel. While he lives in his childhood home in Marin, that home has not been renovated. Most of his savings are retirement accounts that will be used to support his wife after Paul passes.

### 3. Circumstances of the Offense

Under Section 3553(a), a sentencing judge must also consider "the seriousness of the offense," as well as the "nature and circumstances" surrounding that offense. 18 U.S.C. § 3553(a)(1)-(2)(A). The Guidelines are meant to advise courts on sentencing for only a "heartland" of cases: the "set of typical cases embodying the conduct that each guideline describes." *Koon v. United States*, 518 U.S. 81, 93 (1996). Where, as here, a court is faced with an atypical case outside of that "heartland," it should consider an appropriate variance from the Guidelines.

Mr. Giusti's admissions in his guilty plea show that this is not the typical corruption case. He did not act for his own financial benefit. And the large loss value reflects his longevity at the company more than moral culpability. The advisory Guidelines range should be adjusted substantially on that ground alone.

### 4. Need to Avoid Unwarranted Sentence Disparities

Section 3553(a)(6) directs sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007) ("Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing.") (citations omitted). Indeed, as the Ninth Circuit has held, "[t]he need to avoid unwarranted sentencing disparities among codefendants involved in the same criminal activity has long been considered a legitimate sentencing concern." *United States v. Ray*, 930 F.2d 1368, 1373 (9th Cir. 1990). This sort of disparity is "one of the most important evils the guidelines were intended to cure." *Id.*

Paul's employer received a Deferred Prosecution Agreement rather than a felony conviction. The most closely situated individual defendant is John Porter, Paul's supervisor who authorized and approved all of Paul's conduct during the period for which he supervised Paul. Mr. Porter was sentenced to three years of probation, including six months of home incarceration, and a $30,000 fine. The Court emphasized that Mr. Porter did not act for his own gain but always in the scope of his employment.

Like Porter, he did not act for financial gain and always within the scope of his employment. But unlike Porter, Paul always acted at his supervisor's direction. For this reason, Paul should receive the lesser sentence of three years probation and 300 hours of community service, together with the $30,000 fine.

### 5. Deterrence

The Court must also weigh the potential deterrent effect of any sentence. There is zero risk that Paul will be in this position again and reoffend and as a practical matter, he will never

again be in a position to do so, as he has been terminated. *Cf. Gupta*, 904 F. Supp. 2d at 355 ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, [the defendant] is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result."). Even more significantly, this case has exacted a significant emotional and physical toll, not only on Paul, but on his family, as well. He has already felt the acute pain and embarrassment of prosecution. He stands before this Court and his community with the stain of a felony conviction. As courts in this circuit have recognized, a "felony conviction and the conditions of probation constitute[] sufficient specific deterrence to prevent [defendants like Paul] from engaging in similar conduct in the future." *See United States v. Edwards*, 595 F.3d 1005, 1011 (9th Cir. 2010). Accordingly, the proposed sentence would be an adequate deterrent.

### 6. Protection of the Public

Finally, in determining the sentence to be imposed, the Court must consider the need to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). As the letters submitted in Paul's support show, he is not a criminal from whom the public needs protection. But the Court need not rely on the letters written in support of Paul on this issue. The PSR itself recognizes that it is unlikely that he would be a risk to reoffend. PSR, Sentencing Recommendation at 2-3. *See, also, United States v. Carmona-Rodriguez*, No. 04-cr-667-RWS, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (imposing a below-Guidelines sentence on a 55-year-old, first-time offender based on the fact that "defendants who [are] over the age of forty . . . exhibit markedly lower rates of recidivism"); United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines, at p. 28 (2004).

### C. Paul's Substantial Assistance Warrants the Requested Sentence

While the requested sentence is supported by the 3553(a) factors alone, Paul's immediate and substantial cooperation further reinforces that it is an appropriate sentence. The government recognizes that his cooperation warrants a downward departure. Given such cooperation, Paul should not receive the same sentence as his supervisor who, with far more advanced education,

directed and approved Paul's illegal actions.

## VIII. CONCLUSION

For the above reasons, we request that the Court sentence Mr. Giusti to three years' probation and 300 hours of community service, together with a $30,000 fine. Such a sentence reflects the seriousness of the conduct while taking into account Mr. Giusti's individual history and characteristics, including his lack of advanced education and his personal history of serving his community, and appropriately avoids sentencing disparity while recognizing his substantial cooperation.

Dated: December 7, 2023                    */s/ Hartley M.K. West*
                                           HARTLEY M. K. WEST
                                           Attorney for Defendant Paul Giusti